UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
WASHINGTON D.C.

Gregory O. Davis, Sr.,                                              )
1238 Palmer Rd., Fort Washington, MD 20744       )
                                                                         )
Arthur Haynesworth                                             )
15301 Michigan Rd.,            Woodbridge, VA 22191        )
                                                                         )
Clarence Sanders                                                )
7304 Pacella Ct.,Clinton, MD 20735                     )
                                                                         )
Cedric Smith                                                      )
Bureau of Engraving                                           )
14TH & C STREET, S.W.                                       )
Washington, DC 20228                                        )
                                                                         )
Paul Walker                                                        )
10728 Holaway Drive,                                          )
Upper Marlboro, MD 20772                                 )
                                                                         )
Brian Kimball                                                      )
Bureau of Engraving                                           )
14TH & C STREET, S.W.                                       )
Washington, DC 20228                                        )
                                                                         )
Robert Wall                                                        )
1422 2nd St,, Lanham-Seabrook, MD 20706           )
                                                                         )
Wayne Clark                                                       )
1444 Howard Rd., SE, Washington, DC 20020         )
                                                                         )
Lincoln Ashe                                                      )
Bureau of Engraving                                           )
14TH & C STREET, S.W.                                       )
Washington, DC 20228                                        )
                                                                         )
Nathaniel Taylor                                                )
1519 Strider Ct., Hanover, MD 21076                   )
                                                                         )
Hiram Vega                                                        )
2296 Sansbury Drive                                           )
Chesapeake Beach, MD 20732                             )

1

Christopher Heyward                                          )
10005 Laforge Ln., Upper Marlboro, MD 20774                 )
                                                            )
Kenneth Morris                                              )
11005 Penny Ave., Clinton, MD 20735                         )
                                                            )
Julius Smith                                                )
5407 Freelark Place, Columbia, MD 21045                     )
                                                            )
Virginia Tisnio                                             )
2713 Bulkhead Dr., Woodbridge, VA 22191                     )
                                                            )
Shoon Mak                                                   )
5055 Seminary Rd., #937, Alexandria, VA 22311               )
                                                            )
James Rorie                                                 )
1200 Buchanan Cir., Fort Washington, Md. 20744              )
                                                            )
Keneth Dickens                                              )
7307 Webster Ter. Fort Washington, MD 20744                 )
                                                            )
Aileen Joy                                                  )
Bureau of Engraving                                         )
14TH & C STREET, S.W., Washington, DC 20228                 )
                                                            )
                    Plaintiff's                             )
v.                                                          )
                                                            )          Civil Action No.
Henry M. Paulson, Jr. Secretary                             )
U.S. Department of Treasury                                 )
1750 Pennsylvania Avenue, N.W                               )
Washington, DC 20220                                        )          Jury Trial Demanded
                                                            )
Christopher Cooch                                           )
          &                                                 )
Thomas A. Ferguson                                          )
          &                                                 )
Chief David Lindsey                                         )
Bureau of Engraving                                         )
14TH & C STREET, S.W.                                       )
Washington, DC 20228                                        )
                                                            )
                    Defendant's                             )

COMPLAINT
(Race/Color, Age Discrimination; Harassment,  Retaliation Hostile Work Environment And
Complaint For Declaratory Judgment, Permanent Injunctive Relief And Damages)

INTRODUCTION

1.      Gregory O. Davis, Sr., and  other Officers bring this civil action pursuant to the

Civil Rights Act of 1964 as amended, 42 USC. Section 2000e, ("Title VII"); the Civil Rights Act

of 1866, as amended and pursuant to 42 U.S.C. §1981 ("Section 1981"); Title 29 Section 1606.8

Bureau of Engraving & Printing Bureau's policy under 31 CFR 605.1 — 605.14, Circular No:

70-04.6, Section 7 (Policy for Official Authorized Use) —Item K. No: (3,4 & 6) and District of

Columbia Common Law.  Gregory O. Davis, Sr. (hereinafter "Davis") and the other Plaintiff's

asserts that because of their race (African American), color (black), and age they were

discriminated, harassed, denied equal pay, and retaliated against by the Defendants.  Plaintiff's

also assert that Defendant's continuously discriminated, harassed and retaliated against them

because of their race, color and age.  That this illegal discrimination has continued to the present

time.

JURISDICTION

2.      This Court has jurisdiction over the subject matter of this civil action

pursuant to 28 U S C Section 1331.  This action is authorized and instituted pursuant to Section

706(f) of Title VII, 42 U.S.C. § 200e-5(f); and 42 U.S.C. § 1981 as amended.   Plaintiff's file this

complaint after exhausting their administrative remedies at the Department of Treasury.

(hereinafter "DOT") and the EEOC.

VENUE

3.      Venue is proper in this judicial district because Plaintiff's are employed by

3

DOT in Washington D.C., and all events that give rise to the claim in this Complaint took place in this jurisdiction.

PARTIES

4.     Plaintiff's are all Minority Police Officers, and United States citizens, some are residents of the District of Columbia, while others are residents of the State of Maryland and the Commonwealth of Virginia.  At all times relevant to the complaint the Plaintiff's were employed by Bureau of printing (hereinafter "BEP") within the DOT.  The BEP Police is the single largest resource of the Office of Security who is responsible for providing the personnel necessary to physically secure the buildings and grounds within the building, to secure the product with law enforcement status with geographical jurisdiction extending to the Bureau's facilities and grounds within jurisdiction provided by law, while providing perimeter control by protecting access points to include performing housekeeping functions such as automotive traffic control and escort services for custodians of high valued securities.  The Police Force performs its mission through a series of pre-positioned fixed posts.  Each post has an assigned perimeter and post order procedures along with Police General Orders that are equipped with a direct line telephone to the CPOC and a slide duress alarm.  All Police Officers are armed to back each other up in the event of a terrorist attack against the United States Currency Producing Plant.

5.     Defendant Henry M. Paulson, Jr. (hereinafter "Secretary or Paulson") is the Secretary of the Department of Treasury which is a United States Government Agency, with headquarters in Washington, D.C.  Secretary Paulson is responsible for its personnel actions and practices.

6.     Defendant Christopher Cooch, (hereinafter "Cooch") is White, and the head of

the Police Operations Division, and the Police Commander of the Plaintiff's, and responsible for all actions taken by the Police Department.

7.     Defendant's  Thomas A. Ferguson (hereinafter "Furguson") and Chief David Lindsey are senior Officers of Defendant.

<u>STATEMENT OF FACTS</u>

8.     Plaintiff's have worked at the Bureau of Engraving and Printing within the Police Operations Division as Police Officers in different capacities and ranks at 14th and C. Street South-West Washington, D.C. 20228, (hereinafter "Washington Facility") for several years. Beginning on January 15, 2000, Defendant's have continuously  discriminated against Plaintiff's, in violation of their civil rights.

9.     Beginning in 2002 to the present date, Plaintiff's have been denied being paid for services, denied promotions, denied basic Agency required rights, bypassed for assessment and pay increases, retaliated against because of their lawful actions and denied fair treatment because they attended and testified against the Agency in lawsuits or complaints filed against the Agency and because they are all Minorities.

10.     The Plaintiffs' contend that Mr. Thomas A. Ferguson deliberately targeted the Washington, D.C. facility by contracting out the functions of the Police Force because of race while deliberately excluding Fort Worth, Texas Facility (hereinafter "Texas Facility") which is predominantly a White Police Force.  The predominately African American Police Officers have been targeted and harassed by dual standards perpetrated through Management with a continued blatant disregard for African Americans because of their race which has created a hostile working environment and institutionalized unequal treatment towards Plaintiff's  that is currently

being control by racist management officials whose main objective is to eradicate Police functions.

11.     When Plaintiff's filed EEOC complaints, grievances, and unfair labor practices complaints against DOT involving discrimination, Plaintiffs' experienced extreme hostility and retaliation in the workplace.   In support of this continue attack against minorities at the Washington, D.C. facility, the Director failed to take action to correct discrimination and mistreatment of the Plaintiff's.

12.     On July 12, 2000, the NAACP Federal Sector Task Force findings, the 91st NAACP Convention Delegates, President/CEP, National Federal Sector Task Force met on the subject Rampant Federal Sector Employment Discrimination by Leroy W. Warren, Jr., Chairman NAACP Federal Sector Task Force.  Mr. Warren issued a copy of the findings to Mr. Ferguson, in his document "Examples of BEP's Hostile Work Environment," line 3, It states:  "White managers have referred to ethnic minorities as "Niggers," "MONKEYS," and "Black Bitch."

13.     As a result of this ongoing practice Chief David Lindsey (Chief Office of Security) and Commander Christopher Cooch responded to Mr. Darrell Bailey (O.E.O.P) Investigator from Main Treasury, and asserted that Mr. Cooch's racial e-mail was a training tool that was utilized by D.C. Metropolitan Police Department under Chief Charles H. Ramsey of the D.C. Metropolitan police Department..

14.     Ferguson, at the order of Commander Cooch deliberately targeted the Washington Facility, by contracting out the functions of Plaintiff's as a result of their race and color, while the Texas Facility which is predominantly a White Police Force has retained their police functions.

15.     White management at the behest of Commander Cooch issued and shared e-mails which was offensive by depicting African Americans as 'MONKEYS," while justifying their actions as a training tool.  This email is actually used as training tool for Black officers to date.

16.     Commander Cooch contracted out the Communication Police Operations Center (CPOC) while the Fort Worth Texas (CPOC) is ran by Police Officers who are predominately White, in retaliation to complaints made by Plaintiff's.

17.     Commander Cooch contracted out  Plaintiff Officer's door duties at the Washington Facility, while doors at the Texas Facility are controlled by predominately White Police officers.

18.     Commander Cooch barred  Plaintiff Black Officers at the Washington Facility from entering Currency Sections while the predominantly White Texas Facility Officers are still currently entering the Section in spite of the recent theft that occurred in the Texas Facility.

19.     Defendant's have ordered the  Plaintiff officer's at the Washington Facility to have an overhead that consist of a Office Chief, Commander, and Deputy Commander while the Texas Facility only has an Inspector who answers to a civilian personnel, plant manager.

20.     Commander Cooch has ordered  Plaintiff Black Officer's work hours to be changed and reduced at the Washington Facility in retaliation to Plaintiff's protected actions while the officers work hours at the Texas Facility remains the same.  Joseph Guion, 1st. Vice Chairman/FOP, informed the Executive Board of the Union that Defendant's did so in retaliation against Plaintiff Davis.

21.     The Sergeants promotional processes have been changed four (4) times at the Washington Facility in retaliation to Plaintiff's complaints, while the Texas Facility police

promotional process remains the same.

22.    Plaintiff Black Officers have been barred from entering (CPOC) by Chief David Lindsey the next day after Congressman Bob Filner visited the facility, whereas white officers in Texas are not barred.

23.    Defendant Cooch has barred the Plaintiff Officers in Washington D.C. facility from participating on the money shows to down grade officer's job functions as a result of race, color and in retaliation against Plaintiff's complaints.

24.    Plaintiff Officers have been threatened by Defendant that "two man rule" while on post are no longer permissible, while the rule has been maintained in the Texas Facility.

25.    Defendant's denied Sergeant Rios, a certified drunk driver alcohol test expert, the right to train Plaintiff's because they are Black.

26.    Defendants' have denied Plaintiffs CCN Numbers thus down grading police functions, contrary to the actions taken in the Texas Facility, because of Plaintiff's race, color and age.

27.    Defendants' refused to accept Bill 218 for off-duty officers carrying weapons because Defendants' do not want to recognize the predominantly Black Officers while off duty as Police officers, whereas the Texas Facility are allowed this privilege.

28.    January 9, 2006, Plaintiff Aileen Joy won her Arbitration Case against Defendants' and was reinstate to her Police position at the BEP.  As a result of Officers Joy victory, Defendant Cooch bragged to subordinate employees that he will take revenge against Plaintiff's "that any minor infractions would lead to officers termination while under his command".  Defendant carried out the threat, by charging Sergeant Jeffrey Bruce,  who is

African American with unauthorized use of a government vehicle, which lead to immediate disciplinary actions.

29.    In continuos retaliation Defendant Cooch carried out actions to terminate, Officer Kenneth A. Dickens, Officer Kerri Williams, Lieutenant Ricky Russell, and Officer Aileen Joy of Black officers, who were reinstated, except Lt. Russell who is on administrative suspension

30.    Defendant Cooch ordered lengthy terms of administrative leave, denied these officers  representation that is afforded to them under the law, and threatened them.

31.    Plaintiff Aileen Joy was charged by Defendant Cooch for allegedly falsification of medical document, Verification of Treatment (VOT) form #833338, that was submitted in connection with a worker's compensation claim, and worker's compensation fraud.  DOT conducted its investigation and subsequently terminated Plaintiff in violation of her rights pursuant to both the Federal Service Labor-Management Relations Act ("Statue"), 5 U.S.C 7101 et seq., and numerous articles of their Agreement.

32.    Defendant Cooch personally concluded that Plaintiff Joy submitted false medical information, and thereby placed Plaintiff, Officer Joy on administrative leave, confiscated her credentials and suspended her law enforcement authority because she is Black..

33.    Defendants' conduct an unlawful interrogation of Officer Joys in violation of her rights under 5 U.S.C. 7114(a) (2) (B) and 7116(a) (1) and (8).  The Bureau also violated the FOP contract under Article 56.06 insofar as the investigation began on or about October 2, 2003, but the investigators' report was not issued until February 2, 2004, 128 days after the investigation began.  This is an established pattern that continues to 2006 in violation of the existing Union contract.  Defendant Cooch stated that Plaintiff Joy was unfit to be in the Police

force because of his racial bias against Plaintiff.

34.    On January 20, 2006,  Marla L. Gissentanna Defendants' Employee and Labor Relations Specialist, responded to Mr. John Berry's Esq., request for information regarding Plaintiff Davis investigation by stating the following: "This letter is submitted on behalf of Commander Christopher Cooch regarding the information request you submitted on January 5, 2006 on behalf of Officer Greg Davis in reference to an administrative investigation regarding comments made by Officer Davis in a Roll Call in the Fall of 2004.  The Office of Security has not proposed any action against Officer Davis concerning the investigation in which he was interviewed on or about March 17, 2005.  Officer Davis was not the subject of the investigation and is not entitled to investigative documentation per this article. It is the policy of the Office of Security not to release any information concerning open investigations. At the present time, there are no open investigations in which Officer Davis is the Subject of the investigation. The Special Investigations Unit does not have on file any investigation in which Officer Davis was the Subject of the investigation."

35.    Notwithstanding the above statement, Plaintiff Davis weapon along with 144 other Police Officers to include all Office of Security personnel not excluding Chief David Lindsey were pulled according to Glen Alonso (Assistant to the Chief) when he made the statement in the presence of my Union Official Nathaniel Taylor (Chief Shop Steward), Captain Gregory P. Miller, Training Officer Joseph Shepard and General Investigator James Owens that private contractors will test the weapons and that this is in-fact an Administrative Investigation and that Davis was not the target of the investigation.

36.    Davis weapon along with many more Officers weapon was pulled and replaced

10

with a temporary weapon until the ballistic was proven that the weapon shoot in the elevator was not an Officers." The serial number on Davis weapon was B220315 and it was replaced by weapon 220190, and placed in a gun box and seal by number 0481812 (Green).

37.    Davis was informed by Mr. Owens that his weapon would be returned within two weeks.  Davis then filed a complaint about the confiscation of his weapon.  This complaint was not resolved in violation of Article 56.06 and  Article 56.07 of the Union Contract.

38.    On February 21, 2006 Defendants' through Sergeant Virginia Tisnio informed the Plaintiffs while in Roll Call that there will no longer be a "two (2) man rule" in the Police cruisers and that the second Officer from now on, will be assigned to walk around the Annex and Main Buildings constantly. This rule is discriminatory and violates the rules of safety for the Plaintiff's and this rule has been instituted in the Washington Facility and not at the Texas Facility because Plaintiff's are Black.

39.    On March 2, 2006, Defendants' through Sergeants Kenneth Morris, Anthony Seneck and Charles Knicley for the second time informed Plaintiff's while in Roll Call, that two(2) Officers are no longer allowed in the cruiser, and that they would need permission.  This rule is discriminatory and violates the rules of safety for the Plaintiff's and this rule has only been instituted in the Washington Facility, and not in the Texas Facility.

40.    On March 5, 2006 Plaintiff Officer Dickens returned to work in concurrence with a settlement between Joseph Smith Esq., (Officer Dickens Attorney) and the Bureau that Officer Dickens would receive two (2) weeks of Corporal training upon returning to work and that he would be compensated for the end of the fiscal year 2005 yearly gain sharing bonus. Defendants' have refused to honor this agreement.  In further retaliation, Defendant Cooch issued Dickens a

U.S. Treasury BEP Police Shield 187 which represents "Dead Cop" in LA.

41.    On April 12, 2006 Defendant Lindsey issued a new BEP Office of Security Directive, Number: 06-04, titled (Traffic Violation Citation Procedures). In this new policy the Chief limited the Plaintiff Officer's ticket writing authority for notice of infractions, under summary arrest which is stated as follows: Major Violations: Reckless driving, Leaving the scene after colliding, without proper damage, leaving the scene after colliding, with personal injury, driving under the influence of intoxicating liquor or drugs, Operating without a valid permit, operating after suspension or revocation, operating over 30 m.p.h. in excess of the posted speed limit, Failure to surrender permit after suspension or revocation. Police Officers may issue NOI for "No Permit" or "No D.C. Permit," but shall not summarily arrest the operator except summary arrest for "No Permit" or "No DC Permit".  The Chief then goes on to state "In all instances in which an NOI is issued for a moving violation and no summary arrest is made, a police report will be submitted through the chain of command to the Operations Branch Inspector, outlining the circumstances.  The memorandum shall include the police officer's justification for making the traffic stop and the reason for issuing the citation."  Parking Violations:  "Police Officers may issue parking citations and, when necessary, have vehicles towed: When the parked vehicle presents a security risk to the Bureau of Engraving and Printing." Defendant has placed these restrictions on the Plaintiff's to downgrade Plaintiff's functions to that of security guard because the Plaintiff's are Black.  This rule has not been instituted at the Texas Facility because majority of the officers are White.

42.    On April 20, 2006 Defendants through Captain Matthew Richburg, Lieutenant Garry Fykes, Sergeant Charles Knicley, and Anthony Seneck, informed Plaintiff's while in roll

call that Defendant Cooch issued an order that all police cruisers have been pulled out of service to prevent liability as a result of the new ticket policy and restrictions. This order exposes to Plaintiff's to danger whereas the Texas facility are not exposed to such danger.

43.    Bill H. R. 218 was signed by the Speaker of the House of Representatives and the President of the Senate., pro tempura, under Public Law 108-277, under the One Hundred Eight Congress of the United States of America, dated July 22, 2004. H.R. 218 allows all Federal Authorized Police Officers to bear arms while in an off-duty capacity who are qualified law enforcement officers. The Plaintiff's, U.S. Treasury BEP Police meet such standards as required by Chapter 44 of Title 18, United States Code, as amended by Section 926A to 926B (Carrying of concealed firearms by qualified law enforcement officers. Nevertheless, Defendants stated in the memo dated August 25, 2004 that: "Absent a specific showing of how this issue (H.R. 218) affects the Bureau, we recommend that no advice be given on whether or not the new law covers current or retired BEP police officers." Defendant through Diane Mullaney further stated "A BEP police officer has no arrest powers or other authority to enforce the law, beyond that of an ordinary citizen, while in an off-duty status or at any time while outside the Bureau's jurisdictional boundaries." This same interpretation and restrictions do not apply to officers at the Texas Facility. This is a clear violation of Plaintiff's rights under Title VII, and discrimination against Plaintiff's.

44.    To the contrary, Defendant's Employee Handbook Manual for Rules and Regulations dated October 2005 under Code of Conduct states; employees are expected to conduct themselves in a proper manner while on Bureau premises, whether on-duty or off-duty. Employee's off premises, misconduct may also be the subject of a disciplinary and/or corrective

or adverse action if there is a nexus between that misconduct and the efficiency of the Bureau's

operations. And employee's off-duty, off-premises conduct is expected to be such that it will not

interfere with either his/her performance of the Bureau's trust in the employee's ability to

perform those duties; interfere with the Bureau's mission or the employee's official duties; or

discredit or bring criticism upon the Bureau. Such misconduct may result in disciplinary and /or

corrective or adverse action up to and including removal."

45.    Defendants' have disciplined Plaintiff's for off duty violations even though

according to Defendant's Diane Mullaney, "A BEP police officer has no arrest powers or other

authority to enforce the law, beyond that of an ordinary citizen, while in an off-duty status or at

any time while outside the Bureau's jurisdictional boundaries."  Defendants have failed to

mention over the years that Plaintiff's DC/BEP Police Officers are Federal Police Officers as

mandated by Congress. Defendants have discriminated against Plaintiff's with these policies

which are not enforced at the Texas facility.

46.    The United States Bureau of Engraving and Printing Federal Police Force are

statutorily authorized as Special Police under the Protection of Public Property Act, 40 U.S.C.

318 and the Act September 30, 1996, Public Law 104-208. Div. A, Title I & 101 (f). 110 Stat.

30009-346, 31 U.S.C. &5141 with jurisdiction expressly limited to BEP premises and specified

surrounding areas.  The U.S. Treasury BEP Police have general law enforcement powers to

protect persons and property under (40 U.S.C. 318© and (d)), and are entitled to carry and use

appropriate weapons, including firearms, within their jurisdiction. Defendant's violated this law

against Plaintiff's because they are Black.

47.    The Director of the BEP is also authorized to appoint uniformed guards as special

14

police by derived authority 50 USC 318 Sections "a" through "d" which legislatively authorized

the Administrator of General Services to appoint guards as special policemen and to promulgate

rules relating to offenses whenever the United States has exclusive or concurrent jurisdiction

upon some property or buildings. This statue authorizes the Administrator to relegate this

authority.  The authority is relegated to the Secretary of the Treasury under Federal Property

Management Regulations, Temporary Regulation D-40, dated July 25, 1973 in 31 CFR  Part

605, Section 605.1 through 605.14. The BEP's Police Authority is also premised on a delegation

of authority from the Administrator of the General Services Administration (GSA) to the

Department of the Treasury, and on the Treasury Directive 19-02, "Delegation of Authority to

the Directors, BEP and U.S. Mint, to appoint uniformed guards." dated March 16, 1988. TD 19-

02 in accordance to the Act of June 1, 1948, as amended (62 Stat. 281; 40 U.S.C. 318 ©.

48.    Plaintiff's BEP police officers in Washington D.C., are not paid at the special pay

rate applicable to Federal Law Enforcement officers because the primary duties of BEP police

officers differ from those of Federal Law Enforcement officers entitled to the special pay rate."

Defendant chose to deny Plaintiff's Law Enforcement Retirement by merely not allowing the

Plaintiff's to work in Special Investigative Unit along with Lieutenant Edward Williams who

currently is the sole Police Officer working this position more then 50% of the time performing

investigations as a result of will and choice.  The Officers within the Police Operations Division

all have been denied working this unit because BEP refuse to allow Plaintiff's to perform these

functions.  This restrictions are enforced in the Washington Facility, and not at the Texas

Facility.

49.    Defendant, the Director of the BEP is also authorized to appoint uniformed

15

guards as special police by derived authority 40 USC 318 Sections "a" through "d" which

legislatively authorized the Administrator of General Services to appoint guards as special

policemen and to promulgate rules relating to offenses whenever the United States has exclusive

or concurrent jurisdiction upon some property or buildings. This statue authorizes the

Administrator to relegate this authority.  This Special Police created to maintain the

predominately African American Police Force as Guards without expressly being recognized as

legitimate certified federal law enforcement Police Officers trained by the Federal Law

Enforcement Training Center in Glynco, Georgia.

50.     On March 22, 2006, Defendant through Larry R. Felix issued Circular No. 71-

0.47 on the subject of "Personal Items in Production Areas." Under Section 1. Purpose and

Scope. This Circular establishes the policy of the Bureau of Engraving and Printing

(BEP/Bureau) prohibiting employees from having personal items in production areas.  This

policy applies to employees of the Bureau of Engraving and Printing in Washington, D.C.

(BEPWDC) and the Western Currency Facility (WCF).   Under Section 6 (a). Responsibilities.

The Office of Security, WDC and Security Division WCF shall be responsible for conducting

routine physical walk through in production areas, as well as, video surveillance.  This will

ensure employees abide by the Bureau's policy of not allowing personal items into production

areas.  Security violations (BEP Form 9090) will be issued for any violations to the policy and

will be reported to the section supervisor and division manager/office chief for appropriate

action."

51.     On April 13, 2006 Defendant Cooch issued an Employee Survey that was

conducted by Pamela J. Gardiner on Washington Facility by unit employees to determine

customer satisfaction level of services provided by BEP Police Operations Division. This survey was administered by the Bureau's IT office over a two week period to allow employees and contractors to express themselves dealing with Police performance standards which had 350 responses that projected an overall positive image of the Police Operations Division.  Defendant did not conduct the same survey to employees at the Texas Facility.  Defendant Cooch had expected to receive derogatory response to use in retaliating against Plaintiff's.

52.     On April 17, 2006 Defendant issued an Internal Communications Bulletin titled "Pressing BEP Issues that Affect You".  In this bulletin it stated "Effective Wednesday, April 19, 2006, the Office of Security, through the Police Operations Division, will initiate new security procedures at the entrances/exits to production and other security areas. The BEP Police Operations Division will perform random and unannounced inspections of parcels, packages and other items carried by employees entering and exiting the above-mentioned areas. These inspections will be conducted during varying times and on differing days."  This order was in violation of the rules and procedures which affect only Plaintiff's in the Washington Facility, and does not affect officers in the Texas Facility.  Police in the Texas Facility are allowed to perform these functions whereas those in the Washington Facility are not allowed.

53.     On April 17, 2006 Defendant Cooch issued Police General Order titled "Random Unannounced Inspections of High Security Areas."  Under Procedures line 3, it states: "The officers will position themselves outside of the section entrance in order to maintain visual contact with employees entering or leaving the section and storing personal items in the locker area." This policy contradicts Agency policy which applies to Officers in Texas.

54.     On May 17, 2006 Defendant through Sergeant Charles Knicley informed the mid

17

night Officers in Roll Call that they are required to wear their reflective vest during outside foot patrols by the orders of Defendant Cooch. Objections were voiced by Officers on this issue as being identified as walking targets. The night before, the Officers in roll call were read an advisory on MS-13 gang members (Paz) possibly being in the area who are on a mission to kill Police Officers. It would seem reflective vests should be used for their intended purpose (traffic enforcement), and not while conducting foot patrols where the advantage of cover of darkness is beneficial to observing criminals or terrorist for those who wish to intrude or breach our perimeter of security.  This order was issued to expose Plaintiff's to danger, and such order has not been issued in the Texas Facility.

55.    On May 16, 2006 Corporal Nathaniel Taylor was notified by Sergeant Zachary Henderson; He had to take a random drug test at the Bureau's health unit located in room 508 Main Building 5th floor at approximately 11:00 a.m. that day.  Earlier that same day Corporal Taylor had all ready used the men's room unbeknownst to him that he was going to be tested, as a consequence of this, Corporal Taylor was unable to provide any urine sample.  This was in violation of standing order because Plaintiff was Black.

56.    On May 25, 2006 Defendant informed Corporal Nathaniel Taylor that his drug test were reported as a "refusal to test", even though Corporal Taylor made every attempt to provide a sample to the health unit doctor unfortunately he was unable to do so.  Not once did he attempt to express unwillingness or refuse to comply with the health unit demands.    Thereafter Defendant Cooch informed Taylor that the full range of disciplinary actions, including removal from Federal service, will be imposed upon him.  Defendant then  immediately removed Plaintiff Taylor from his sensitive position as a Police Officer.  Defendant did not attempt to interview

18

Corporal Taylor on why he was unable to provide the urine sample or was he given any other chance to provide same because he is Black.

57.     Because Defendant had prejudged Plaintiff Taylor, he then referred him to the Bureau's BEP's Employee Assistance Program (EAP), for counseling and to learn about the availability of treatment and rehabilitation, because Plaintiff is Black.

58.     On May 30, 2006 Plaintiff  Taylor received a letter from Defendant Cooch placing him on Administrative Leave, until a decision is reached regarding his drug test being reported as a "refusal to test".  He was also required to report to Deputy Commander Roger A. Gross on a daily bases, failure to do so would be considered absent without leave (AWOL).  This was done because Plaintiff is Black.

59.     Defendant Lindsey also signed letter title "Procedures for an Inability to Provide a Urine Specimen", which informed Plaintiff Taylor the procedures dealing with the drug testing specimen.   In the Collection procedures Column 3 it states as follows: (3) "The employee must make at least one effort to provide a urine specimen within two hours from the start of the collection process, which is counted from the appointment time stated on the employee's section note or the time of the employee's arrival to collection site". Plaintiff Taylor was not allowed the two hour window before he was striped of his police powers in violation of Defendant's own policy.

60.     As of June 2006 Plaintiff Joy was not made whole as ordered by Seymour Strongin (Arbitrator), which was endorsed by William L. England, Jr., (Administrative Law Judge) on April 25, 2005.  Corporal Aileen Joy has been reinstated to her position as a U.S. Treasury BEP Lead Police Officer for more then six month.  Defendant has refused to restore

19

her leave and back pay. Instead Stephanie Simms (Benefit Payment Control Branch) of the Government of the District of the District of Columbia informed Plaintiff that owes D.C. unemployment the amount of $7725.00, because Defendant prevailed on the unemployment hearing. Moreover, Plaintiff has been denied the opportunity to apply for promotion to the rank as Sergeant during these proceeding, like they had afforded Lieutenant Ricky Russell who is currently under administrative investigation and suspended with pay while at home, because Plaintiff is Black.

61.    On September 19, 2006 Defendant Cooch issued a new memorandum to all Police Officers on accessing Communication Police Operations Center (CPOC), which stated the following: "Sergeants working in CPOC are not to allow any officers or corporals into the CPOC without the expressed permission in writing (EMAIL) for specific purpose from a lieutenant or higher. Sergeant's will be held accountable for any officers found in the CPOC without the express permission in writing (EMAIL) for a specific purpose from a lieutenant or higher. Said permission will be sent to the CPOC sergeant and copies forwarded to Inspectors Wilcox, Holloway and Captain Hall. There will be no after the fact emails. Any investigation will be initiated for any violation of his order. Sergeants will ensure that contract dispatchers do not allow access of officers and corporals into the CPOC by advising them at the beginning of each shift. Only a sergeant will relieve a sergeant unless no other sergeant is available. If no sergeant is available, a lieutenant will relieve the sergeant." This directive was issued by Defendant Cooch for no just cause except to retaliate against Plaintiff's for inviting Congressman Filner to visit the facility. There is no such directive at the Texas Facility.

62.    On January 4, 2006 John Berry, Esq., issued Commander Cooch a letter

20

requesting information pertaining to an investigation dealing with the elevator shooting that took place in the Spring of 2004. On October 4, 2005, Mr. Berry was told by the Agency's Labor-Management Relations Specialist that Commander Cooch's office had no knowledge of any investigation in which Plaintiff Davis was subject and that the Commander would furnish a letter indicating that there were no open investigations pending regarding your inquiry upon a written request from this office.  On October 17, 2005 Mr. Berry drafted a letter to the Agency asking that they provide a letter indicating that Plaintiff Davis was not the subject of any investigation. December 12, 2005, Mr. Berry was informed by the Agency's Labor-Management Relations Specialist that the Commander could not provide such a letter regarding investigations. Mr. Berry then informed the Bureau that he would have to institute a Union Information Request under the Collective Bargaining Agreement to determine if Corporal Davis was currently the subject of an investigation by the Agency.

Commander Cooch has blatantly perjured himself. Again this pattern distorting the truth by the Bureau's ongoing practice dealing with a predominately African American Police Force has become the norm for management as exercise in their behavior.

63.     On January 14, 2005 Defendant Cooch issued a memorandum in response to his e-mail dated September 17, 2004, titled:

"Does your company work this way?" "Start with a cage containing five monkeys.  Inside the cage, hang a banana on a string and place a set of stairs under it. Before long, a monkey will go to the stair and start to climb towards the banana. As soon as he touches the stairs, spray all of the other monkeys with cold water.  "After a while, another monkey makes an attempt with the same result, all the other monkeys are sprayed with cold water.  Pretty soon,

21

when another monkey tries to climb the stairs, the other monkeys will try to prevent it. "Now, put away the cold water. Remove one monkey from the cage and replace it with a new one. The new monkey sees the banana and wants to climb the stairs. To his surprise and horror, all of the other monkeys attack him. After another attempt and attack, he knows that if he tries to climb the stairs, he will be assaulted. "Next, remove another of the original five monkeys and replace it with a new one. The newcomer goes to the stairs and is attacked. The previous newcomer takes part in the punishment with enthusiasm! Likewise, replace a third original monkey with a new one, then a fourth, then the fifth. "Every time the newest monkey takes to the stairs, he is attacked. Most of the monkeys that are beating him have no idea shy they were not permitted to climb the stairs or why they are participating in the beating of the newest monkey. After replacing all the original monkeys, none of the remaining monkeys have ever been sprayed with cold water. Nevertheless, no monkey ever again approaches the stairs to try for the banana. Why not? Because as far as they know that's the way it's always been done around here. "And that, my friend, is how a company policy begins."

64.    Defendant Cooch email calls Plaintiff's as Monkeys in total violation of Plaintiff's civil rights under the Law. Moreover, Defendant Cooch has continued to call Plaintiffs's Monkeys and has continued to use this email as a training tool for Plaintiff's because they are Black. The Texas Facility does not use this manual.

65.    Defendant Cooch and Lindsey's claim that Chief Charles H. Ramsey of the Washington, D.C. Metropolitan Police Department uses this discriminatory illustration tool extensively by D.C. Metropolitan Police Department as a training tool for his officers as a result to receptiveness to chant in organizations.

66.     On January 25, 2005 Plaintiff requested a confirmation from Chief Charles H. Ramsey, who has refused to respond.  ) received a request to comment on Cooch and claim that As of this day Chief Ramsey has failed to respond.

67.     In March 2005 Sergeant Edward Williams (Special Investigative Unit) and Steve Olson (General Investigator-1810) interviewed various Police Officers regarding personal observations and explanations of the Officers action at BEP Center of Excellence (Auditorium). Questions included were Officers sleeping in offices, going through employee's refrigerators, putting their feet on the tables, or smoking cigarettes, taking their breaks in these areas and some of the questions were asked as to why some Officers announced to other Police Officers to be careful of hidden camera's while in the Auditorium and to stay out of those areas. This investigation only targeted Mid Night Officers that have Senior Ranking Officers and Senior Union Representatives on this shift.

70.     On March 17, 2005 Sergeant Edward Williams and Steve Olson interrogated Plaintiff Davis and demanded why he informed the Officers in roll call about the hidden camera that was put in place to bust Officers for conduct unbecoming at BEP Auditorium.  Plaintiff Davies was also questioned wether he saw Officers sleeping, taking food out of employee's refrigerators, smoking etc.  This investigation was conducted by Defendant Lindsey to find fault in Plaintiff's and terminate their employment because they are Black.  Defendants failed to follow Union contract under administrative investigation under Article 56.06 45 day rule, or Article 56 which requires clearance in writing of the final disposition of the investigation.

71.     On March 2, 2005 under Certification Number: 2005-043-RYM Plaintiff Davis applied for the Sergeants position only to be denied.  Defendants did not articulate any reason for

denying the promotion except in retaliation against Plaintiff.

72    On April 20, 2005 Certification Number: 2005-043-RYM Defendant Cooch issued a memorandum to all Police personnel who apply for the current vacancies for Sergeant, Lieutenants, Captains to study their Police Manual, General Orders and all policy memoranda generated since January 1, 2001.  Cooch further stated that rating panels have been selected and will convene over the next several days. Those individuals, who made the cut as decided by the Human Resources staff, will be asked to appear before their respective promotional board. Then he concluded in his memo that Inspector Anthony Holloway will be the Chairman of the Captain's Board along with two (2) outside agency representatives, Inspector Richard Wilcox who will be the Chairman of the Lieutenant's Board along with two (2) outside agency representatives and that Captain Murray Hall would lead the Sergeant's Board along with two (2) outside agency representatives. This was a standard norm for the promotional process.

73.    On May 2, 2005 Defendant Cooch cancelled all Interview Boards and stated via his managers and supervisor officials that each candidate would be selected based on their prospective KSA's.  Cooch took this discriminatory action because the officers were Black.

74.    In May 2006 Commander Christopher Cooch issued Officer Dickens a Memorandum of Proposed Suspension for 28 days for conduct unbecoming of an Officer while off-duty. This case is still pending under the advisement of Joseph Smith Esq. Mr. Dickens attorney.

75.    On May 29, 2005 the following promotions for managerial and supervisory personnel became effective recognizing the following promoted officials:  Captains Matthew Richburg and Glenn Williams, Lieutenants Amos Hall and Edward Williams, and Sergeants

Christopher Heyward, Charles Knicley and Victor Rios.

76.    On June 2, 2005 Deputy Commander Roger A. Gross issued an e-mail on the Promotional Ceremony that would be held at the BEP Center of Excellence for the Newly Promoted selected Officials.  Three White Officers were promoted which included; Richard Wilcox Glen Williams and Charles Knicley.  This was the first time three (3) Whites were promoted in many years, therefore, Commander Cooch decided to have a Promotional Ceremony.  All other times there was no promotional ceremony because only Blacks were promoted.

77.    Defendant's decision to scrap the promotional oral interview board based on the rank prior to the selection process, and select candidates based on their KSA's was in violation of Plaintiff's rights.  And even though Certification # 2002-75-AJC was cancelled, Defendants' continued to promote candidates in direct violation of Defendant's own rules and standards.

78.    On June 30, 2005 Plaintiff  Haynesworth sent Thomas Ferguson a memorandum dealing with Defendant denying the Officers access to the Sections within the Bureau as first responders. The concerns that was addressed is to respond to all areas as expeditiously as possible without delay, in order to prevent harm to employees, damage to product, or to verify alarms before the evacuation/non-evacuation of buildings.   Officers at the Texas Facility are not denied access as those in Washington D.C.

79.    On June 30, 2005 Defendant Cooch denied  reimbursement for the Fraternal Order of Police and/or Bureau Police officer for one-half of the costs of Liability Insurance purchased by the officers. Under Section 636 of the Treasury, Postal Service and General Appropriations Act for Fiscal Year 1997, P.L. 1-4-208, Title VI, 110 Stat. 3009-363 (1996) as

amended.  Plaintiff's were entitled to such reimbursement, but were denied because they are Black.  Whereas officers at the Texas facility were granted reimbursement.

80.    Defendants prohibited Officers from making investigations at the Bureau in its entirety  yet Management authorized only Sergeants and above to be investigators within Investigative Unit under the Office of Security; again 40 U.S.C. 318 remained the same. Officers where prohibited transporting arrested criminals to Park Police station as a result having a MOU with Park Police to transport BEP Police prisoners to their police station to process DC/BEP Police prisoner while being charged a fee, however, the MOU was cancelled with U.S. Park Police which allowed the DC/BEP Police to transport their own prisoners to Park Police Station when they got police certified cruisers, again 40 U.S.C. 318 remained the same.  All added authority allotted to the U.S. Treasury BEP Police functions were all inclusive under the same authority, 40 U.S.C. 318 ©.

81.    Plaintiff's cannot conduct investigations, make apprehensions, prosecution, detaining individual or supervision of individuals suspected or convicted of offenses against the criminal laws of the United States as outlined under Section 8331(20) or 8401 (17) of Title 5 under Section 4823 of Title 22 of the United States Code more than 50% of the time as a result of the Bureau not allowing it.   Defendants' have deliberately limited the scope of the BEP Police functions to avoid the law enforcement retirement that can be allotted to the BEP Police because they are a predominately African American Police force.  Defendants are deliberately downgrading the BEP Police functions to avoid the law enforcement retirement pay because Plaintiff's are predominately African American.  All functions that are not performed more than 50% of the time to qualify for the LEO's 6© retirement is by choice.

82.    On July 13, 2005 Officer Kenneth A. Dickens was given a Notice of Proposed

Removal by Defendant Cooch for alleging that Officer Dickens provided false statement during

an Official Investigation on September 10, 2004, which was misleading information to two

management officials, two supervisors and the reporting investigator (080/1810) which involved

an Officer from United States Park Police (USPP). The charges were based on the evidence that

Officer Dickens was involved in a high speed pursuit with USPP.

83.    On July 21, 2005 Plaintiff Davis, forwarded an e-mail to Deputy Commander

Roger A. Gross on behalf of the Fraternal Order of Police Labor Committee and gave a copy of

the e-mail to Dawn Haley (Chief, Office of External relations) informing management that

Congressman Bob Filner will be visiting the Bureau Police while reviewing some of the

functions that are being performed by Officers. A request was made to DC Gross to have the

Congressman review CPOC along with other functions of the Police Force. That same day Mrs.

Haley responded by e-mail, that she had two floor tours scheduled already and that the

Congressman needed to be cleared by the department prior to scheduling. This information was

unbeknownst to Chairman Haynesworth and me. When the FOP/BEP Police Labor Union

received the Bureau's policy dealing with Mrs. Haley assertion, it stated at the bottom that this

policy does not apply to Unions. Defendant's took Congressman Filners visit personally and

retaliated against Plaintiff's

84.    On August 24, 2005 Defendant Cooch issued  a memo stating: "On Tuesday,

September 6, 2005, DECO a new contractor for screening personnel, will be working under the

direction of the Police Operations Division." The doors that were protected by Police Officers

reviewing the X-Ray machines were contracted out at the Washington Facility which has a

predominately African American Police Force while the Texas Facility were not outsourced to private contractors because they are predominantly White.

85.    In direct violation of Agency rules and on November 10, 2005 at Police's post, 2-A-13 (13 Street entrance & Exit post): Mr. Louis Cunningham Jr., (Deco Security Services) entered the Bureau placing what appeared to be a loaded weapon on the X-ray machine which appeared to be an automatic weapon. Joyce Hardy (Deco Security Services & Retired Metropolitan Police Officer) was stationed at the X-ray machine at the time of the incident. During an interview with Ms. Hardy she made the following statement: "Mr. Cunningham placed the weapon on the X-ray machine and I stopped and asked, "You have a weapon." Mr. Cunningham responded, "I have a permit." Ms. Hardy at no time brought this matter to the attention of Private Elena M. Langer (U.S. Treasury BEP Police Officer) who was standing at the card reader processing authorized personnel entering or leaving the facility, nor did Ms. Hardy make any attempt to inform me (Corporal Greg Davis Sr.) the Officer in charge of this event. Ms. Hardy then allowed Mr. Cunningham Jr., to exit the facility without authorized Police Officials being aware of the incident in question.

86.    Defendants compromised security at the Agency due to contracting of these functions to a non-government source. Even though the Director and the Chief of Security, David Lindsey were fully aware that this type of incident would occur that is why at the entrance post which is called 1-M-17 that leads to the Director's office the Bureau opted not to outsourced that entrance and exit post because it leads directly to his office.

87.    On September 8, 2005 Inspector Anthony Holloway issued an e-mail to his managers and supervisors that stated the following: "If an officer observes an incident and fails

28

to take action that officer may be disciplined for their failure to act." This order is contrary to any orders issued to the Texas Facility.   Defendants placed all liabilities on the shoulders of the Black Officers who have been striped of their functions, which were contracted out to DECO.

88.     On September 28, 2005 in the Bureau's "Internal Communications" Bulletin issued for fiscal year 2006, it is noted that early-out retirement is authorized for all eligible employees at the Bureau of Engraving and Printing. Police Officers are not eligible for early-out retirement. This has been an established practice since the inception of the BEP Police under (083 Series) for unknown reasons.  BEP Police Officers are restricted as employees whose pay is in comparison as to GSA employees which are currently under special pay rate TR. The  United States Mint Police are offered the buyout whereas the U.S. Treasury BEP Police are excluded in because Plaintiff's are Black.

89.     On September 20, 2005 The Honorable Bob Filner Member of Congress U.S. House of Representatives wrote a letter to Thomas A. Ferguson (Director/BEP) thanking Mr. Ferguson for his candor in addressing the issues dealing with the BEP Police Force. Congressman Filner stated that he was delighted to hear the Mr. Ferguson would not be contracting out any additional security functions or implementing any force reductions impacting the Security Force, which is a major concern of the security personnel.  The Congressman then requested a written response affirming the position he stated in the meeting with the Congressman.

90.     October 19, 2005 Thomas Ferguson  responded to Congressman Bob Filner request for confirmation.  Mr. Ferguson in brief stated the following: "While concerns regarding the A-76 process and its effects to personnel are understandable, rest assured that no Bureau

Police Officer has lost a job due to A-76 legislation, nor has security at the Bureau been compromise due the contracting of these functions to a non-government source.  The Bureau has no future plans to displace any of our current Police Officers."

91.     On November 10, 2005 following the gun incident, Elena M. Langer who was standing at the card reader adjacent from the x-ray machine asked Joyce Hardy (DECO employee) who was operating the X-ray machine, why she didn't say anything to her or Plaintiff Davis? She said, "I didn't want to create a scene." Had this been a Police Officer in the same scenario he/she would have immediately been taken out of uniform and strip of their police powers. On that note, after the incident Ms. Hardy continued to work the X-ray machine as if nothing happened.

92.     Defendants exposed Black officers to unwarranted danger, at this Federal facility by assigning DECO contractors on the x-ray machines who are only civilian employees, without powers of arrest or powers to bear arms in the event of an emergency.  Plaintiffs' who are all Black  have to protect DECO employees, with no backup in the event of an attack whereas officers at the Texas facility who are predominantly White are not exposed to the same danger.

93.     On November 22, 2005 in Dallas, Fort Worth Texas Bureau employee Donald Edward Stokes was sentenced to 41 months imprisonment and ordered to pay $10,000 fine and indicted for theft for $30,000 in flawed currency. Stokes worked as a Final Verifier in the Security Verification Section and his job included verifying that imperfect, flawed, or test currency was properly destined for destruction. Since the 1800's, Officers were allowed to enter and exit the currency sections at-will in order to check for security violations to prevent such occurrence. As a result of this unfortunate incident the Police at the BEP Washington D.C.,

30

facility were banished from all sections, whereas the BEP Police Officers in Fort Worth Texas

where the incident occurred continued to enter and exit the currency sections at-will.  This

interference with the Police in the performance of their duties such as refusing the Officers

access to various areas and sections of the Bureau in emergency situation where life, death and

the theft of national security product such as the U.S. Currency creates a hostile working

environment for Plaintiff's.

94.    Defendants violated Union contract under Article 12 Section 12.02 (General) it

states the following "It is agreed that personnel policies, practices and matter affecting working

conditions not specifically covered by this agreement will not be changed by the Employer

without prior notice to and negotiation with the Union to the extent required by law." Under

Article 12.04 (Negotiability Claim) it states the following: "On any claim of nonnegotiability,

the Employer will provide the Union with a written declaration of nonnegotiability and its basis

for reaching such conclusion.  The Union will then be free to pursue its statutory remedies under

the Federal Service Labor-Management Relations Statute and regulations of the Federal Labor

Relations Authority."

95.    Defendants selected candidates with less experience which harmed seasoned

Officers who were not selected through a fair and equitable manner via Sergeants Board based

on the candidates job knowledge.  Defendants eradicating the competitive process which allowed

Commander Cooch to select candidates with less police experience as a result of "good old boys

cronysm" and used the process to retaliate against Plaintiffs who filed grievances of unfair labor

practices against Defendants'.

31

96.    On December 30, 2005 Chief Charles H. Ramsey issued a letter to Chief David

Lindsey, Office of Security at the BEP and declared a crime emergency on December 2, 2005,

because of the increase in violent crimes, specifically homicide and robberies.  The Chief

requested the BEP Police assistance in decreasing the occurrence of crime in and around the area

described in our Cooperative Agreement.

97.    On January 16, 2004 Commander Cooch informed Plaintiff that he would have to

take his flimsy concern to the next level to be reimbursed 8 hours administrative time. Plaintiff

filed a complaint with the EEOC, and won.  After Defendant was order to pay Plaintiff Davis,

Defendant Cooch felt that it was a personal affront to him.  Commander Cooch retaliated against

Plaintiff because he lost at the EEOC.

98.    Based on the aforesaid, Commander Cooch vowed to retaliate against the Black

Police Officers because he felt that the "Monkeys" were challenging their White Boss.

99.    Furthermore, when Plaintiff testified for and against the agency on age

discrimination complaint (United States District Court for the District of Columbia Case Number

01-0031 C), Commander Cooch, felt that Plaintiff were not loyal to the Defendant and continued

his retaliatory acts against Plaintiffs.

100.    On April 26, 2004, Phillips Edwards (Training Instructor) requested Plaintiff

Davis assistance as a Control Tactic Instructor, this request was denied by, Lieutenant Meinrad

Guagliardo by the order of Commander Cooch.

101.    From May 19 -20, 2004 Plaintiffs were excluded from the Training Division, at

32

the order of Commander Cooch because they were Black.

102.    On August 4, 2004 while being detailed to the Training Division, Lieutenant

Matthew Richburg stated that on July 12, 16 and 23, 2004, Plaintiff Davis was not authorized to

work his standard 2 ½ hours of overtime, thereafter, Acting Inspector Murray S. Hall and

Lieutenant Matthew Richburg summoned Plaintiff and interrogated him, in violation of Police

General Orders Number: 03-033 dated June 3, 03 under Procedures for Code Orange Section 1

& 7.  Due to such interrogation, Plaintiffs' were underpaid for their overtime.

103.    Plaintiff's have been denied their night differential pay for services rendered as a

result being assigned to the Training Division as Tactical Training Instructor, or other

assignments, at the order of Defendant Cooch.

104.    On September 17, 2004, Plaintiff Greg Davis represented Corporal Kim Parker in

the EEOC process and he was denied being paid overtime on October 15, 2004 by Captain

Anthony Holloway after being assigned to represent her by Sergeant Amos Hall, on the orders of

Commander Cooch.  On October 8, 2004, Plaintiffs  forwarded a memo to Commander Cooch

for retaliatorily suspending volunteering positions (e.g. Tactical Training Instructor/Field

Training Officers, & Bike Patrol Officers).

105.    On October 5, 2004. Commander Cooch placed a "New Shift Reporting Times"

to Black Officers within Police Operations Division, which did not affect white officers in

similar positions.

106.    On October 20, 2004, Commander Cooch assured Plaintiff Haynesworth that he

will provide necessary information to Police Union on the "New Shift Reporting Time," but thereafter refused to provide the information in retaliation for the Black Officers protected activities.

107.    The Shift Reporting Time has been in Place since 1880, and according to Corporal Susan Vandigriff, Corporal Lawrence Smith, Corporal Arthur Haynesworth (Chairman/FOP) and Corporal Joseph Guion (1St Vice Chairman/FOP) Commander Cooch changed the work schedule because of the legal activities of Plaintiff Davis and the other Black Officers.  Whereas the work schedule remains the same for White Officers in the Fort Worth Texas BEP Police.

108.    On February 27, 2004 Plaintiff Davis Sr. issued Commander Christopher Cooch a memorandum pertaining to working the lower parking lot while neglecting to protect BEP employees on Water Street South/West DC near Holgates parking lot.  The Commander was informed that many of the employees who were standing outside waiting for the shuttle bus were female employees who were standing in the dark with the possibility of being robbed or attack. He was then reminded that Congress granted the BEP Police extended jurisdiction to allow the officers to protect our employees located in these sites however the restrictions placed upon the Officers restrict them from protecting these employees as a result only going around the building while patrolling the lower lot that has contractors.

109.    On the same day, Defendant Cooch issued out an e-mail to his managers and supervisors that Corporal Davis bring up some excellent points.  He then goes on to state: "We need to better utilize both our manpower and equipment. First it sounds as if he was working the

34

foot beat in a vehicle.   Effective immediately all officers assigned to the lower lot shall work the

assignment on foot.  At no time is the use of a motor vehicle permitted. This will allow us to

utilize the vehicle to better ensure the safety of all of our employees in a fair and equitable

manner."  This action was in direct retaliation for Plaintiff Davies suggestion.


110.    On February 28, 2004 Corporal Susan Vandirgriff informed Corporal Greg Davis

the following via her e-mail: "Just to let you know that your memo and name was brought up at

Saturdays Roll Call.  Stating that your memo said no patrol cars are to be allowed down on the

lower deck.  That officers are to be on foot, stating that 'this is your Union member'. This causes

a lot of hostile comments, towards you.  Just to let you know if anyone does say anything to you,

this maybe were it came from.  It appears that management wishes for other Union members to

come down on you to stop your memos.  I believe that you are going to them with to much

information as I stated before.  Let them do whatever; they are manager, if they go against any

legal Union requirements, just give them notice through a lawyer from now on.  Or it is very

possible that you will get management to have the very people you're trying to help go against

everything you are trying to accomplish.  You need to stop sending the memo's giving them too

much information.  If a lawyer sends it, it has a basis for confidentiality between management

and your lawyer correspondence.  If you have any questions call me ."

111.    June 30, 2004 David Lindsey (Chief, Office of Security) issued  an additional

memorandum on the subject dealing with "Firearms Qualification Policy."  Chief Lindsey stated

the following: "All Office of Security personnel that are authorized to carry and/or possess

firearms (handguns) are required to undergo the standard course of instruction and to qualify

with each assigned weapon at a minimum of once quarterly attaining a score of at least 240.

Police personnel (GS-083), General Investigators (GS-1810) and Security Specialist (GS-080), shall also qualify and re-qualify with shoulder weapons (shotguns and submachine guns) at least annually with a minimum score of 240." As a point of order, the majority of the Security Specialist (080's) and General Investigators (1810) are White.

112.    Since 1998 to 2006 management has refused to promote Corporal Greg Davis Sr. to the position as Sergeant as a result of his union activities. He applied for the Sergeants position seven (7) times under the following certifications: (1) 98-0131-YDC, (2) 2001-136-FCM, (3) 2002-075-AJC, (4) 2003-007-AJC, (5) 2004-004-LJH, (6) 2004-055-LJH and (7) 2006-14-RYM only to be denied, because he is Black and because of his complaints against Defendants.

113.    Defendant Cooch has changed the promotional process on seven occasions without notifying the union in compliance to the union contract under Article 2 Section 02.02 - 03 and Article 12 in addition violating Article 19 Section .05 which he falsely provided the Federal Labor Relations Authority by filing false promotional standards to the FLRA Authority stating that the Sergeants Board was part of the promotional process.

114.    On October 5, 2004 Commander Christopher Cooch issued out a memorandum to unit employees on "New Shift Reporting Times". Effective Sunday, December 1, 2004, reporting times for all operational shifts will change. The new reporting times are as follows:

| A-Company | B-Company | C-Company |
|---|---|---|
| Dress Time:  0030 | Dress Time:    0630 | Dress Time:    1445 |

| Roll Call: | 0045 | Roll Call: | 0645 | Roll Call: | 1500 |
|---|---|---|---|---|---|
| On Post: | 0100 | On Post: | 0700 | On Post: | 1515 |

Unfortunately, cost saving under management rights to reassigned did not apply to the Whites in Fort Worth Texas within Police Operations Division, Office of Security work schedule to include not changing the supervisors and managers work schedules in Washington D.C. facility.

115.    The Director and the Chief, Office of Security failed to take the appropriate action necessary to stop Defendant Cooch from meeting with predominately African American female Officers on numerous occasions while blatantly refusing to meet with the predominately African American male Officers which violated the contract and the federal labor relations statue. On October 22, 2004 the Union filed an Unfair Labor Practice for Commander Violation of 5 U.S.C. 7114(a) (2) (a) and (b) of the FLRA statue by holding formal discussions with bargaining unit employees without affording the Union an opportunity to be present.

116.    On October 8, 2004 Plaintiff Davis while detailed to day shift from mid night shift as a Tactical Training Instructor working under Jack B. Boyd III (Manager-Training Division) management refused to pay him. Plaintiff was also denied his pay for night differential, while being charged 16 hours AWOL.

117.    October 22, 2004 on that same day, Chairman Arthur Haynesworth filed an Unfair Labor Practice against Commander Christopher Cooch because he issued a memorandum to all Police Officers right after meeting with the Union a memo stating "New Shift Report Time." The Commander broke his word.

118.    On December 8, 2004 Commander Christopher Cooch issued out another memorandum on the subject dealing with "New Dress Times". Effective Sunday, January 2,

2005 dress times for all operational shifts will change. The new dress times are based on the traditional practice of ten minutes and are as follows:

| A-Company | B-Company | C-Company |
|---|---|---|
| Dress Time: 0030 | Dress Time: 0630 | Dress Time: 1445 |
| Roll Call:    0040 | Roll Call:    0640 | Roll Call: 1455 |
| On Post:    0050 | On Post:    0645 | On Post:    1505 |
| Ending Time: 1100 | Ending Time:    1700 | Ending Time: 0115 etc… |

119.    On November 8, 2004 Commander Christopher Cooch issued a Police General Order Number: 04-0053 on the Sergeants Promotional Process informing all the promotional candidates the new policy and requirements on how to get promoted in compliance to PGO.

120.    On November 9, 2004 Sergeant Gerald Field, mid - night supervisor informed all the officers in Roll Call that CPOC Operators will be telling the Officers what to do by the orders of David Lindsey (Chief, Office of Security). November 10, 2004 Captain Murray Hall, Lieutenant Johnson and Sergeant Fields reaffirmed the sergeant's statement.

121.    On December 23, 2004 Defendant Cooch issued out memorandum scheduling a tentative list of officers who will be attending the Presidential Inauguration Thursday, January 20, 2005.  Corporal Lincoln Ashe was one of those officers who volunteered to work this assignment as a driver.  During this detailed he was ordered by Sergeant William Watson to proceed to the Presidential Inauguration site to receive the necessary assignments prepared by Metropolitan Police for assisting agencies. As a result of this order Commander Christopher Cooch issued Corporal Ashe AWOL charges. This matter went to David Lindsey

(Chief of Security) who in turn forwarded this matter into the hands of the Internal Investigative Unit. In conclusion of the findings Corporal Ashe received an AWOL charge and found guilty as charged for exiting the Annex garage by van without authorization for the Inaugural Detail to include not disclosing his whereabouts which supposing impacted and adversely negatively of the mission therefore management charged Corporal Ashe AWOL for the time as indicated when he left the agency.  Corporal Ashe was charged AWOL for unauthorized absence because he is Black.

122.    On January 31, 2003 these corporals competed for the Lead Officers positions via the competitive process which was eradicated by the Department of Treasury, Bureau of Engraving and Printing Police Force.  All of the said officers are African American who were penalized as a result of this new pay policy which allowed officers with only 30 month of law enforcement experience to equal in pay to the season veterans of the Police Force.  This included; Leonardo Rowe, Lawrence Smith, Robert Walls, Christopher Heyward, Gregory O. Davis Sr., Elanda Blue, Nathaniel Taylor, Lincoln Ashe, Amilcar Marrero, Joseph Guion, Timothy House, David Goodwin, Michael Loving, Keith Anderson, and Zachary Henderson.

123.    On February 19, 2003 under Certification Number: 2003-007-AJC Defendant Cooch hand pick candidates for the Sergeants position bypassing the Sergeants Board. His time at the Bureau was less then six (6) month.  The candidates who were selected were automatically promoted under the new pay plan after 30 month of law enforcement experience at the Bureau. This policy allowed management to select candidates with less government time and experience with less police experience to be selected without considering candidates with more experience education and seniority as Police Officers within the Bureau.

124.    On March 11-12, 2003 under Certification Number: 2003-007-AJC  Defendant

Cooch interviewed the following candidates: Gregory Davis, Gerald Fields, Leonardo Rowe,

Lawrence Smith, Virginia Tisino and Edward Williams at his office without any knowledge or

history of each candidate and their work experience. The Commander asked assorted questions

that had nothing to do with job performance and past accomplishments.  Based on his limited

understanding as a newly hired Commander he made his decision based on merits unbeknownst

to the candidates he did not promote, and promotions are continuing in spite of the ongoing

lawsuit contrary to Defendant's position.

125.    May 6, 2003 David Lindsey (Chief, Office of Security) issued out a memorandum

on the subject dealing with the subject "Essential Personnel."  "The designation of Essential

Duty Personnel, in addition to all Police Officers, shall apply to all Office of Security General

Investigators (1810's) and Security Specialists (080's) who are authorized and qualified to bear

firearms."

126.    On June 13, 2003 Commander Christopher Cooch issued out a memorandum

titled "CPOC Duties and Responsibilities." The Commander then outlined the Corporals duties

while they were stationed in CPOC with the newly hired contractors. "The CPOC Corporal is

responsible for ensuring that training has been provided by the vendor to new contractors

assigned to the CPOC."   There were no vendors in CPOC to train the contractors. The trainers

of the contractors were Officer Charles Knicley, Kevin Reese, and Lincoln Ashe just to name a

few.

127.    Vendors never worked the CPOC to train the newly hired contractors.  The

Commander then continues by stating the Corporal will ensure that the (FMS) is monitored by

the Contractor FMS Operator (FMSO) along with monitoring the CCTV System. The Corporal

will make certain that the FMSO is adhering to the following procedures, etc…

128.    On June 13, 2003 Deputy Commander Roger A. Gross issued an e-mail stating

that Corporal assigned to CPOC will be assigned as "Team Leaders in CPOC".  On June 19,

2003 Defendant Cooch issued a memo titled "CPOC Duties and Responsibilities revised

6/19/03."

129.    On July 7, 2003 Director Thomas A. Ferguson (/BEP) signed the Cooperation

Agreements between Federal Agencies and Metropolitan Police Department which was finalized

by Charles Ramsey (Chief/MPD) office on August 7, 2003.

130.    On July 16, 2003  Mr.  Tuab responded by explaining "Commercial and

        Inherently

activities in compliance to OMB Circular No. A-76." He defined functions within Police

Operations Division, that according to Mr. Tuab, do not qualify as inherently governmental

activity that can be contracted out. Inherently governmental activities do not require contractors

to take over job function because it is an activity that requires government employees to perform,

while commercial activities are job functions that can be performed by private contractors that

are not protective activities for government employees only.

131.    July 18 2003. The United States General Accounting Office (GAO) conducted a

study on the subject "Coin and Currency Production/Issues Concerning Who Should Provide

Security."  This report was forwarded to the Subcommittee on Domestic and International

Monetary Policy, Trade and Technology, Committee on Financial Services, House of

Representatives.  The (GAO) study asserted the following under Background.  "The authority of

the Mint and BEP to establish police forces is derived from 40 U.S.C. 1315, which provides the

Mint and BEP police with powers to enforce federal laws and regulations for the protection of

individuals and property, including making arrest and carrying **firearms**." Prior to the enactment

of the Homeland Security Act of 2002, the Administrator of the General Services Administration

(GSA), through GSA's Federal Protective Services (FPS), was responsible for policing

government buildings under GSA's control and had delegate this responsibility to the Secretary

of the Treasury who re-delegated it to the Mint and BEP Directors to appoint their own police

force. Although the Homeland Security Act amended 40 U.S.C. 1315 by transferring

responsibility for this policing authority to the Secretary of the Department of Homeland

Security (DHS), the savings provision in the act state that the existing delegation will continue to

apply replacing 40 U.S.C. 318.  It was also discovered in the (GAO) study on page 5 that

security legislation found in Public Law 104-208 (1996) provided the U.S. Mint and the BEP

Police Officers with the authority to carry out their duties on Mint and BEP property and the

surrounding areas and while transporting coins, currency, and other agency assets.  Such

authority has been eliminated by Defendants.

132.     The U.S. Treasury BEP Police Uniformed Police Force is a Para-military

organization with ranks of private, corporals, sergeants, lieutenants, inspectors, deputy

commander, commander, special assistant to the chief and office chief.   The Washington

Facility has a different Chain of Command than the Texas Facility, and the Washington Facility

is deliberately set to discriminate against plaintiff's.

133.     Washington Facility has a great overhead dealing with chain of command that has

eluded Fort Worth Texas cost savings.  The disparate treatment forged against the Officers in

Washington D.C. is a result of ethnicity.  The Bureau has deliberately avoided restructuring both Police Forces by centralizing daily operational functions as one. As a result of this decision the Washington D.C. BEP Police have faced an abundance of racial diversity, abusive by so many of layer giving conflicting orders while terminating and disciplining Officers more so then Fort Worth Texas are a result of race.

134.    On November 12, 2003 Commander Cooch issued a memo informing the candidates for Sergeants promotion to appear on November 18, 2003 before the Sergeants' Interview Board.  And on the same day, pursuant to Certification Number 2002-004-LJH Captain Murray Hall (Chairman/Sergeants Board), Lieutenant Matthew Richburg, and Security Special (080) H. Weber interviewed the following candidates for the Sergeants Interview Board in room 510-A: Gregory Davis, Leonardo, Lawrence Smith, Reginald Parker, William Watson, Michael Loving, and Christopher Heyward, who were all African Americans qualified to appear before the Board.

135.    Reginald Parker and William Watson were promoted to the rank as Sergeants; however there were no promotional ceremony held at BEP Center of Excellence.          Per Police Operational Rule, any Officer who had received any type of disciplinary action for any reason prohibits the candidate from being promoted, which was confirmed by Captain Hall in the presence of Andre Faulk (Labor-Employee Relations Specialist), Mark L. Roy (Labor-Employee Relations Specialist), and Union Official Leonardo Rowe.

136.    On November 12, 2003, Nicole Washington (Attorney-Advisor/BEP) informed Some of the Plaintiffs that they would have to appear before Honorable Robert Leidenheimer and Jane Lyons Assistant United States Attorneys office (AUSA's) to give depositions on behalf

of the government.  On November 18, 2003, Greg Davis was informed by Mrs. Washington that

Mr. Lawrence B. Manley, Esq.  will pose questions to Plaintiff under oath before a court reporter

for Plaintiff to give my deposition on behalf of the opposing counsel.

137.    On November 14, 2003. Captain Murray S. Hall informed Greg Davis via e-mail

that he would be detailed to day shift from mid-nights and that he could request his day off to be

changed or he can take annual leave for Sunday night in order to attend the deposition at

AUSA's office.

138.    On November 17, 2003, Plaintiff informed Commander Cooch that he had eight

hours of leave deducted from his account after he was reassured by Nicole Washington (BEP

Attorney) that it would not be a problem.

139.    On November 19, 2003, Plaintiff Greg Davis requested to be reimbursed the eight

hours annual leave for the time spent at the AUSA deposition. Commander Cooch personally

denied the request.

140.    May 13, 2002 under Certification Number: 2002-075-AJC Corporal Greg Davis

Sr. applied for Sergeant Position. He failed to make the cert however, during further review by

management he later made the cert only to be told that the cert had been closed as a result of a

class action lawsuit. This information was past on by Chief, David Lindsey and Acting

Commander Robert Johnson in the ADR process.  Once his name made the cert the Sergeants

positions was closed.

141.    On June 6, 2002 Robert Johnson (Acting Commander) was issued a letter

addressing the same concerns dealing with the Police credentials.  (AC) Johnson was informed

that all of the BEP vacancy announcements to include the current opening for the Supervisory

Police Officer vacant position that advertised for the new Commander position states on the certification announcement for the protection of "Life". Not once did Management negotiate the terms on the credential <u>limited investigation to be placed on the Police credentials</u>.

141.    On October 21, 2002 the Bureau issued "What's On Your Mind? Forum Q & A Newsletter for BEP Employees. One particular question was asked under Question 3 (DC/FW): "Why aren't BEP police officers on the same GS grade schedule as security specialists? ANSWER: "BEP police officers are appointed and compensated under a different pay grade system than security specialists, who are General Schedule (GS) employees.  The pay grade system that applies to BEP police officers is established pursuant to section 5378(a) of title 5, United States Code, which provides "the Secretary of the Department of the Treasury, or his designee, in his sole discretion shall fix the rates of basic pay for positions within the police forces of the United States Mint and the Bureau of Engraving and Printing without regard to the pay provisions of title 5, United States Code, except that no entry-level police officer shall receive basic pay for a calendar year that is less than the basic rate of pay for General Schedule GS-7 and no executive security official shall receive basic compensation for a calendar year that exceeds the basic rate of pay for General Schedule GS-15."

What non-uniform security/police under 40 U.S.C. 318(d) authorized to bear firearms are under 5378(a) of title 5 that Mr. Kinsey if reverencing too, we the class complainants dear to state none.  His statement is a complete untruth as related to the facts. This is an established pattern of abuse of the justice system dealing with a predominantly African Police Force when it comes to finding of the facts to Officers daily livelihood seeking truths.

142.    The following Security Specialist/General Investigators have the following

firearms that were sanctioned by the Bureau of Engraving.  Lindsay Branson/ B276-469, Thomas

Bryant /B276-460, Billy Byrd/ B276-490, Kevin Casteel /B220-253, Richard Clower /B276-473,

Johnny Curtis Jr. /B141-783, Steve Elgin/ B276-411, Patrick Logsdon B220-238, Kevin

Matthews/B276-476, Steven Olson/ B217-487, James Owen/ B276-498, Carl Pfaender/ B220-

319, Arthur Reynolds/ B173-610, Henry Rivero/ B276-500, Agustin Roman/ B220-186, and

Norman Simms/ B220-232, just to name a few.

143.    On October 30, 2002 Russell U. Carpenter (Manager, Labor-Management

Relations Division) issued the FOP a letter "Contracting CPOC Functions."  Mr. Carpenter wrote

to Arthur Haynesworth (Chairman/FOP) that his letter was to inform him that on November 11,

2002, the Office of Security will contract certain functions in the Central Police Operations

Center (CPOC), currently staffed by Police Officers.

144.    On November 1, 2002 Chairman Haynesworth challenged the A-76 to contract

out the functions of CPOC.  On November 17, 2002 the United States Mint and the Bureau of

Engraving and Printing and the Department of Treasury, adopted a new pay schedule for all U.S.

Mint Police Officers and U.S. Treasury BEP Police except the competitive Corporals who

competed for said position.    The U.S. Mint did not have Corporal/Senior Officers like that of

the BEP Police however through this new pay schedule as a TR Grade 07 Step 2 officers base

salary in previous pay schedule will be matched to the next highest salary at the same Grade in

the new pay schedule, then increased one step, which is found at Grade 7 Step 2 of the new pay

schedule.   In addition to the new pay schedule, the approval was given to the U.S. Mint and

BEP Police to utilize Grade 8 as the full performance level for Officers below the rank of

Sergeant.  Officers, who have been with the U.S. Mint and BEP Police for 30 months at Grade

6/7, are eligible for promotion to Grade 8.

145.    This effort benefitted the majority of White Police Officers at all facilities while the Corporals who competed for Lead Police Officers position via the competitive process were excluded from benefitting during this transition.  All of the competitive Corporals located at the BEP Police Operations Division were Black.

145.    The U.S. Mint Police Chairman voiced his opinion whereas the Bureau denied the FOP/Chairman at the Bureau to attend this meeting to avoid any possible opposition for a smooth transaction of such proposal.  On November 21, 2002 Certification # 2002-75-AJC was cancelled for the promotional process to Sergeant.  Senior Ranking Corporal, Michael Loving, Virginia Tisnio and Greg Davis Sr., met with David Lindsey (Chief, Office of Security), Robert Johnson (Acting Commander/Police Operations Division) and Arthur Hicks (ADR Specialist) met to discuss the cancellation of the Sergeants promotion under Certification # 2002-75-AJC.

146.    November 21, 2002 under Certification # 2002-075-AJC Corporal, Michael Loving, Virginia Tisnio and Greg Davis Sr., met with David Lindsey (Chief, Office of Security), Robert Johnson (Acting Commander/Police Operations Division) and Arthur Hicks (ADR Specialist) to discuss the cancellation of the Sergeants promotion under Certification # 2002-75-AJC. Chief Lindsey stated know promotions will be given until the lawsuit is cleared under the age discrimination case is over, unfortunately, Chief Lindsey did not stand by his word because this case is still pending until this day and many promotions has been held since then.

147.    On March 15, 2001 there was a Class Complaint on Chief, David Lindsey, (Office of Security) and Commander Vivian Ashton, (Police Operations Division) for discriminating against qualified individuals over the age of 40, for promotion. During this

relevant time period, there had been at least five (5) individuals who have been denied promotion to the position of Corporal:  Arthur Haynesworth, William Watson, Edward A. Williams, Robert More, and Joseph Guion. These Plaintiffs were retired military Veterans.

148.    The majority of these Veterans were in the Law Enforcement Field throughout their military tenure, all are over the age of 40, all have between 15-25 years of law enforcement experience, all have been at the BEP longer than the majority of the individuals who have been promoted to the position of Corporal during the relevant time period, who were under the age of 40, and all had less experience and service time as law enforcement officer than those who were members of the class complaint.   This action by the Bureau prevented the Black candidates the opportunity to apply and compete for the rank of Sergeant and Lieutenant during the relevant time period.

149.    The majority of the promoted Corporals during the relevant time period have been with the BEP for less time than Plaintiffs'.  Three of the Plaintiff's were members of the Field Training Officer (FTO) group, responsible for the training those who were promoted over them, to the position of Corporal. The Field Training Officer were Corporals William Watson, Edward Williams, and Joseph Guion.

150.    The individuals who have been promoted during the relevant time period of 1998 to 2001 were under the age of 40 are as follows: Stanley Lee, Christopher Stuart, Irvin Hamilton, Roderick Elam, Steven Jacobs, Duran Odom, Davie Kennedy, Erika Keys-Smith, Virginia Tisnio, Carl Pfender, Richard Montecelo and Norman Simms.

151.    On January  2000  Aileen Joy was employed as a U.S. Treasury BEP Police Officer employed by the Department of Treasury.  Prior to being sent to the Federal Law

Enforcement Training Center (FLTC) located in Glynco Georgia she was shown around the females locker room, she then observed a flat chested, shorthaired, square jawed individual what appeared to be a man wearing military type wool p-coat with men's boots and blue jeans. She asked Officer Zadah Lewis who was showing me around the locker room why that man had just walked into the ladies locker room? That's Nelson replied Officer Lewis, "You'll found out." and we left the females locker room.

152.    In April 2000 having successfully completed training at the (FLTC) She was assigned a locker in the female locker room which made feel very uncomfortable when she was in the presence of Officer Nelson. She then came to the conclusion that Officer Nelson was just a really masculine "Gay Woman" when she brushed against my buttocks with her body which made me very uncomfortable. She then mention Officer Nelson that it was really getting too tight in the areas where we changed and that she needed to be more careful to avoid touching me. At this point, She felt very demoralizing and violated. Every morning thereafter, despite whatever stage of dressing She was in whenever Corporal Nelson arrived this was always after she had arrived in the female locker room. She would at that point stop undressing and move out of my locker area to allow Officer Nelson to get pass me to avoid her touching me again while feeling frightening. She would avoid being close to her to shun that creepy feeling she got ever time Officer Nelson was even close to touching her.

153.    At times while having conversations with Officer Nelson that were initiated by her, utter on one occasions refer to herself as "Steve," when talking about her home life and her children that she is helping dealing with along with her live-in "girlfriend" Sherrie to raise there kids together. Officer would tell me by her own accord how the kids would act out with Sherrie;

but when she got home, then she corrected herself by stating when "Dad" gets home, I mean my brother Steve, they don't act like that".  This particular comments made by Officer Nelson made her even more uncomfortable dealing with her because she had referred to herself as Steve then she implied that she had a brother name Steve who lived in the same household as her to monitor her kids along with Officer Nelsons girlfriend.  She lost many hours of sleep dealing with this issue which has unnerved me very much to the point she would avoid Officer Nelson ever change she could.

154.    Again, Officer Nelson would approach me on her own accord to volunteer information which she was not interested. She would hint to her that she was interested by moving away from her, but she would continue on by just ignoring my jesters. Officer Nelson told me she had "attention disorder" while touch my arms, hands and shoulders during her conversation which she attempted to make less threatening trying to gain my confidence. This would happen over duration of time when she dialogue to me about her personal issues which did not interest me.  Officer Nelson kept this up until she included her into my complaints about her in my individual sexual/gender bias discrimination/harassment case that she filed via the Bureau's EEOC against my supervisors.

155.    Prior to my individual EEOC case, Sergeants Virginia Tisino and Sherry Tutt and I went to the EEOC office to file a complaint against the Department of Treasury, Bureau of Engraving and Printing for failing to uphold our rights as legitimate female employees of our constitutional rights to privacy forcing us female officers to change our cloths in a locker room what appears to represent themselves as being a man after informing me that her name was "Steve" and that she is the man of the household.  The Bureau's EEOC snub our concerns as

50

insignificant and we were brushed off and discouraged from continuing our complaint being told by the EEOC counselor that we should consider how our complaint was going to make the new Police Commander, Vivian Ashton feel.

156.    This was particularly threatening and intimidating to both Sergeants Virginia Tisnio and Sergeant Sherry Tutt because of their supervisory roll as part of the team working for management as supervisors. We the complainants, Sergeant Tisnio, Tutt and Officer Joy. Officer Joy knew that this was a veiled threat letting us know if we pursued this complaint which would further expose a scandal on the Bureau's Police Force, that the new Commander would not feel reluctant towards us and that possible retaliation may occur to us in the near future. This intimidating factor played a significant roll helping us to make our decision to stand down.

157.    At the time Officer Yvette Nelson articulated to Officer Joy while in the female's locker room that her/his name was Steve Nelson which was brought to the Bureau's EEOC attention confirmed Officer Nelson assertion that it is a man. The supporting facts dealing with this case is the fact that Officer Yvette Nelson use to date Officer Shelia Porters cousin who was also employed by the Bureau of Engraving and Printing, Department of Treasury whose name was Nikki. Nikki had told her cousin Officer Shelia Porter, who is also a U.S. Treasury BEP Police Officer that Officer Nelson was not gay, that she was in a heterosexual relationship with Corporal Yvette Nelson who to this day has a penis which is being used as the dominating organ in compliance to hermaphrodites distinguish factor as being identified as a man. This has created a hostile work environment.

158.    All of the female officers until this day have to change in front of Corporal Steve Nelson who is located in the female locker room. The Bureau's disregard for of human rights is

limitless and must be stopped.  Outrage does not begin to cover our feelings about this obvious case of misleading identity.

STATEMENT OF CLAIM

159.    Plaintiff's repeats and realleges each of the allegations contained in paragraphs 1 through 159 above as though fully set forth herein.

160.    The plaintiff were subjected to intentional and willful discrimination because of their Race/Color/Age; when they were continuously threatened, harassed and retaliated against by Commander Cooch from 2002 to the present. The Defendant's engaged in unlawful employment practices in violation of Title VII, and Section 1981.

161.    The Plaintiff's were subjected to intentional and willful discrimination because of Defendant's threats, harassment and retaliatory acts.

162.    The Plaintiff's were subjected to intentional and willful discrimination because Defendant refused to pay them for work and services, denied promotions, denied basic Agency required rights, bypassed them for assessment and pay increases, retaliated against them because of their lawful actions and denied fair treatment because among other reasons they attended and testified against the Agency in lawsuits or complaints filed against the Agency and because they are all Black...

163.    Plaintiff's have suffered personal injury, economic losses, lost pay benefits, lost career benefits and opportunities, emotional distress, and personal and professional humiliation because of Defendant's unlawful discrimination.

FIRST CAUSE OF ACTION

TITLE V11 - DISCRIMINATION

164.    Plaintiff's repeats and realleges each of the allegations contained in paragraphs 1 through 163 above as though fully set forth herein.

165.    Plaintiff's are members of a protected class, Black, African American.

166.    Plaintiff's are the only employees who suffered and continues to suffer the discrimination because they ware Black.

167.    Defendants' promotion of a hostile work environment was an act of discrimination in violation of Title VII, 42 U.S.C. § 2000e-2(a).

168.    Defendant's promotion of a hostile work environment was willful and malicious and was done with reckless indifference to Plaintiffs' right to employment opportunities unfettered by racial discrimination guaranteed to them by Title VII, 42 U.S.C. § 2000e-2(a).

SECOND CAUSE OF ACTION

TITLE VII - RETALIATION

169.    Plaintiffs' repeats and realleges each of the allegations contained in paragraphs 1 through 168 above as though fully set forth herein.

170.    Defendant's continuous threats, harassment, retaliation, and acts of subjecting Plaintiff's to a hostile work environment is in violation of law.

171.    All of these actions by Defendant's were willful and malicious and taken in direct

53

and knowing violation of Title VII, 42 U.S.C. § 2000e-2(a)

### THIRD CAUSE OF ACTION

### SECTION 1981 - DISCRIMINATION

172.    Plaintiff's repeats and realleges each of the allegations contained in paragraphs

1 through 171 above as though fully set forth herein.

173.    Plaintiff's are members of a protected class, Black, African American.

174.    Plaintiff's are the only employees who suffered the discrimination because they

are Black.

175.    Defendants' promotion of a hostile work environment was an act of

discrimination in violation of Title VII, 42 U.S.C. § 2000e-2(a).

176.    Defendant's promotion of a hostile work environment was willful and malicious

and was done with reckless indifference to Plaintiffs' right to employment opportunities

unfettered by racial discrimination guaranteed to them in violation of Section 1981.

177.    Defendant's discrimination was willful and malicious and was done

with reckless indifference to Plaintiffs's rights to employment opportunities unfettered by racial

discrimination guaranteed to them by Section 1981.

### FOURTH CAUSE OF ACTION

<u>SECTION 1981 - RETALIATION</u>

178.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 177 above as though fully set forth herein.

179.    Defendant's continuous threats, harassment, and acts of denying Plaintiffs' their rights and creating and fostering a hostile work environment is an act of retaliation for Plaintiffs' complaints.

180.    All of these actions by Defendant's were willful and malicious and taken in direct and knowing violation of the rights guaranteed to Plaintiffs' by Section 1981.

<u>Prayer for Relief</u>

Wherefore, Plaintiffs' respectfully requests this honorable Court to award appropriate sanctions, awards, compensation, fines, and $100,000,000.00 against Defendants in the interest of justice.

JURY DEMAND

Plaintiff request a jury demand of issues triable by jury.

Respectfully submitted,

Rev. Uduak James Ubom, Esq, DC #449102
Ubom Law Group, PLLC
7600 Georgia Ave. NW., Suite 411
Washington, DC 20012
Tel. (202) 723-8900

Fax (202) 723-5790

Attorneys for Plaintiffs'

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the following complaint was served on all defendants:

Henry M. Paulson, Jr. Secretary,

U.S. Department of Treasury

1750 Pennsylvania Avenue, N.W

Washington, DC 20220

Christopher Cooch

Bureau of Engraving

14TH & C STREET, S.W.

Washington, DC 20228

Thomas A. Ferguson

Bureau of Engraving

14TH & C STREET, S.W.

Washington, DC 20228

Chief David Lindsey

Bureau of Engraving

14TH & C STREET, S.W.

Washington, DC 20228

on _____ day of _____, 2008, by process server or by Certified mail.

_____

Rev. Uduak J. Ubom, Esq.

JS-44
(Rev.1/05 DC)

**I (a) PLAINTIFFS**

GREGORY O. DAVIS, SR. *ET ALL*

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF PG. MD
(EXCEPT IN U.S. PLAINTIFF CASES)

88888

**DEFENDANTS**

HENRY M. PAULSON, JR. ET. ALL

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT DC
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
REV. UDUAK J. UBOM, ESQ
7600 GEORGIA AVE, NW, SUITE 410
WASHINGTON DC 20012 (202) 723-8900

Case: 1:08-cv-00447
Assigned To : Roberts, Richard W.
Assign. Date : 3/14/2008
Description: Employ. Discrim.

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

□ 1 U.S. Government Plaintiff

■ 3 Federal Question
(U.S. Government Not a Party)

🗶 2 U.S. Government Defendant

□ 4 Diversity
(Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | □ 1 | □ 1 | Incorporated or Principal Place of Business in This State | □ 4 | □ 4 |
| Citizen of Another State | □ 2 | □ 2 | Incorporated and Principal Place of Business in Another State | □ 5 | □ 5 |
| Citizen or Subject of a Foreign Country | □ 3 | □ 3 | Foreign Nation | □ 6 | □ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

**□ A. Antitrust**

□ 410 Antitrust

**□ B. Personal Injury/ Malpractice**

□ 310 Airplane
□ 315 Airplane Product Liability
□ 320 Assault, Libel & Slander
□ 330 Federal Employers Liability
□ 340 Marine
□ 345 Marine Product Liability
□ 350 Motor Vehicle
□ 355 Motor Vehicle Product Liability
□ 360 Other Personal Injury
□ 362 Medical Malpractice
□ 365 Product Liability
□ 368 Asbestos Product Liability

**□ C. Administrative Agency Review**

□ 151 Medicare Act

**Social Security:**
□ 861 HIA ((1395ff)
□ 862 Black Lung (923)
□ 863 DIWC/DIWW (405(g)
□ 864 SSID Title XVI
□ 865 RSI (405(g)

**Other Statutes**
□ 891 Agricultural Acts
□ 892 Economic Stabilization Act
□ 893 Environmental Matters
□ 894 Energy Allocation Act
□ 890 Other Statutory Actions (If Administrative Agency is Involved)

**□ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**□ E. General Civil (Other) OR □ F. Pro Se General Civil**

**Real Property**
□ 210 Land Condemnation
□ 220 Foreclosure
□ 230 Rent, Lease & Ejectment
□ 240 Torts to Land
□ 245 Tort Product Liability
□ 290 All Other Real Property

**Personal Property**
□ 370 Other Fraud
□ 371 Truth in Lending
□ 380 Other Personal Property Damage
□ 385 Property Damage Product Liability

**Bankruptcy**
□ 422 Appeal 28 USC 158
□ 423 Withdrawal 28 USC 157

**Immigration**
□ 462 Naturalization Application
□ 463 Habeas Corpus- Alien Detainee
□ 465 Other Immigration Actions

**Prisoner Petitions**
□ 535 Death Penalty
□ 540 Mandamus & Other
□ 550 Civil Rights
□ 555 Prison Condition

**Property Rights**
□ 820 Copyrights
□ 830 Patent
□ 840 Trademark

**Federal Tax Suits**
□ 870 Taxes (US plaintiff or defendant

□ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
□ 610 Agriculture
□ 620 Other Food &Drug
□ 625 Drug Related Seizure of Property 21 USC 881
□ 630 Liquor Laws
□ 640 RR & Truck
□ 650 Airline Regs
□ 660 Occupational Safety/Health
□ 690 Other

**Other Statutes**
□ 400 State Reapportionment
□ 430 Banks & Banking
□ 450 Commerce/ICC Rates/etc.

□ 460 Deportation
□ 470 Racketeer Influenced & Corrupt Organizations
□ 480 Consumer Credit
□ 490 Cable/Satellite TV
□ 810 Selective Service
□ 850 Securities/Commodities/ Exchange
□ 875 Customer Challenge 12 USC 3410
□ 900 Appeal of fee determination under equal access to Justice
□ 950 Constitutionality of State Statutes
□ 890 Other Statutory Actions (if not Administrative Agency Review or Privacy Act)

| ☐ G. *Habeas Corpus/ 2255* | ☒ H. *Employment Discrimination* | ☐ I. *FOIA/PRIVACY ACT* | ☐ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ☐ K. *Labor/ERISA (non-employment)* | ☐ L. *Other Civil Rights (non-employment)* | ☐ M. *Contract* | ☐ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☒ Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ Multi district Litigation ☐ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

28 USC 1331 USC 2000e  Title VII Act

*TITLE VII CIVIL RIGHTS ACT*

**VII. REQUESTED IN COMPLAINT** CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23 **DEMAND $** 100,000,000 Check YES only if demanded in complaint **JURY DEMAND:** ☒ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY** (See instruction) ☐ YES ☐ NO If yes, please complete related case form.

**DATE** 3/6/08 **SIGNATURE OF ATTORNEY OF RECORD** [signature]

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

V:\forms\js-44.wpd